# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-SA-00030-SCT

*MISSISSIPPI DIVISION OF MEDICAID AND*
*DREW SNYDER, IN HIS OFFICIAL CAPACITY*
*AS THE EXECUTIVE DIRECTOR OF THE*
*MISSISSIPPI DIVISION OF MEDICAID*

*v.*

*YALOBUSHA COUNTY NURSING HOME*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/23/2020 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| TRIAL COURT ATTORNEYS: | BEATRYCE McCROSKY TOLSDORF |
| | THOMAS L. KIRKLAND, JR. |
| | SAMUEL PHILIP GOFF |
| | JANET McMURTRAY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JANET McMURTRAY |
| | T. HUNT COLE, JR. |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SAMUEL PHILIP GOFF |
| ATTORNEYS FOR APPELLEE: | THOMAS L. KIRKLAND, JR. |
| | MATTHEW DAVID SITTON |
| | ALLISON CARTER SIMPSON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 08/25/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    The Mississippi Division of Medicaid (DOM) and Yalobusha County Nursing Home

(YNH) dispute four costs submitted for reimbursement by YNH in its fiscal year 2013

Medicaid cost report. The DOM appeals the Hinds County Chancery Court's judgment ordering the DOM to reverse the four adjustments at issue. Because the DOM correctly interpreted the appropriate statutes and because its decisions were supported by substantial evidence, we reverse the chancery court's order and render judgment reinstating the decisions of the DOM.

**FACTS AND PROCEDURAL HISTORY**

¶2. The DOM "is a state and federal program created by the Social Security Amendments of 1965 . . . , authorized by Title XIX of the Social Security Act to provide health coverage for eligible, low income populations." Mississippi Division of Medicaid, https://medicaid.ms.gov/about/ (last visited July 18, 2022). Each state administers its own version of Medicaid through a state plan and associated statutes and regulations. *Id.* "The Mississippi Medicaid State Plan (State Plan) is a detailed agreement between the State of Mississippi and the Federal Government that describes nature and scope of Mississippi's Medicaid Program." Mississippi Division of Medicaid, http://www.medicaid.ms.gov/about/state-plan/ (last visited Mar. 23, 2022). The State Plan is "for use by providers, their accountants, the [DOM], and its fiscal agent in determining the allowable and reasonable costs of and corresponding reimbursement for long-term care services furnished to Medicaid beneficiaries." State Plan Guidelines for the Reimbursement for Medical Assistance Beneficiaries of Long Term Care Facilities,

2

https://medicaid.ms.gov/wp-content/uploads/2021/09/Attachment_4.19-D-Searchable-eff-07.1.21-revised-9.24.21.pdf (last visited Mar. 23, 2022). The Medicaid program is jointly funded by state and federal dollars.

¶3.     Under Mississippi Code Section 43-13-117(A)(18)(b),

> The division *shall* establish a Medicare Upper Payment Limits [UPL] Program . . . for hospitals, and *may* establish a Medicare Upper Payment Limits Program for nursing facilities . . . . The division shall assess each hospital and, if the program is established for nursing facilities, shall assess each nursing facility, for the sole purpose of financing the state portion of the Medicare Upper Payment Limits Program.

Miss. Code Ann. § 43-13-117(A)(18)(b) (Rev. 2015) (emphasis added) (Section 43-13-117(A)(18)(b) was changed by legislation effective from and after July 1, 2021). The UPL program is a federal supplemental payment program that allows hospitals and other facilities to receive the difference between what Medicaid paid for a particular service and what Medicare would have paid for that service.

¶4.     All hospitals in Mississippi are eligible for the UPL program. Miss. Code Ann. § 43-13-117(A)(18)(b). However, under Mississippi Code Section 43-13-145(1), (2), and (3), nursing facilities are already taxed at the maximum rate under federal law. Mississippi Code Section 43-13-145(1)(a) directs that, "[u]pon each nursing facility licensed by the State of Mississippi, there is levied an assessment in an amount set by the division, equal to the maximum rate allowed by federal law or regulation, for each licensed and occupied bed of the facility." Miss. Code Ann. § 43-13-145(1)(a) (Rev. 2021).

¶5.     Three classes of nursing facilities exist in the state: privately owned facilities, government non-state (county-owned) facilities, and state facilities. Because the nursing

3

facilities were already taxed at the maximum rate allowed by federal law, the DOM could not impose any additional tax on nursing facilities to make all facilities in the state eligible for a UPL payment. Accordingly, the UPL program was not available for privately owned or state nursing homes, but only for county or other local government owned or operated nursing facilities. These facilities are able to make intergovernmental transfers (IGT) of the amount of the state's share of the UPL payment, which would not be considered a tax that would interfere with the 6 percent bed tax. The UPL assessment program for qualifying nursing homes first began in 2011. Approximately twenty nursing facilities in the state qualify for the nursing home UPL program.

¶6.     YNH is a long-term care facility owned by Yalobusha County and located inside Yalobusha General Hospital, also owned by Yalobusha County. In May 2013, the DOM announced to YNH that it had received approval for the fiscal year (FY) 2012 and FY 2013 UPL models from the federal Centers for Medicare & Medicaid Services (CMS). For FY 2012, YNH was required to pay an IGT in the amount of $514,850 in order to receive a supplemental UPL payment of $1,937,713. For FY 2013, YNH was required to pay an IGT in the amount of $601,793 in order to receive a payment of $2,264,933. Therefore, YNH paid a total of $1,116,643 in IGT and, in turn, received payments totaling $4,202,646.

¶7.     Under the State Plan, "[a]ll Nursing Facilities . . . shall file cost reports based on a standard year end as prescribed by the provisions of this plan." State Plan 4.19-D, 1-3(A), https://medicaid.ms.gov/wp-content/uploads/2022/05/StatePlanEntireDocument-searchable-eff.-01.01.22-updated-05.05.22.pdf (last visited July 22, 2022). Nursing homes are paid by

4

Medicaid based on a *per diem* rate. The cost report is required to determine the *per diem* rate and to receive a payment from the DOM. It lists the allowable costs it incurs in providing care to Medicaid beneficiaries. The nursing home cost report is filed with the DOM and is reviewed only by the DOM.

¶8.    YNH timely submitted its FY 2013 cost report. Under State Plan 4.19-D, Section I, titled Desk Reviews, "[t]he Division of Medicaid will conduct cost report reviews, as deemed necessary, prior to rate determination. The objective of the desk reviews is to evaluate the necessity and reasonableness of facility costs in order to determine the allowable costs used in the calculation of the prospective per diem rate." The DOM conducted four desk reviews of YNH's FY 2013 cost report.

¶9.    First, on May 19, 2014, the DOM sent a letter to YNH stating that its cost report for FY 2013 "appears to be filed in accordance with the Medicaid State Plan and applicable federal and state laws and regulations. Therefore, no adjustments were made to your reported cost per day and return on equity computation."

¶10.    However, on October 20, 2014, the DOM wrote to YNH and stated that the DOM had conducted a desk review and amended YNH's FY 2013 cost report. The letter stated that "[y]our cost report is subject to additional adjustments brought to the attention of the [DOM] and may be selected for field review, which could result in changed and additional adjustments." The Amended I Desk Review is not at issue. On November 14, 2014, the DOM sent YNH an Amended II Desk Review, again not at issue. Amended II Desk Review also stated that the cost report was subject to additional adjustments.

5

¶11.   On March 11, 2016, YNH received a letter stating that the DOM had "amended your facility's twice previously amended desk review report for the above reference period to remove the 'MEDICAID NH UPL ASSESSMENTS' cost." The Amended III Desk Review removed YNH's UPL payment in the amount of $1,116,643, listed on Form 6, Line number 4-43, under taxes and licenses. Prior to the third desk review, the DOM had allowed YNH's UPL assessment to be claimed as an allowable cost on the cost report.

¶12.   On April 9, 2016, YNH, through its accountant Richard Lefoldt, appealed the Amended III Desk Review. Lefoldt stated that YNH was appealing the adjustment because it "was not in accordance with DOM policy that was in effect for this cost reporting period and the period prior to and at the time that this facility's nursing home rates were determined based on this cost report." Because the UPL payment had been allowed in the FY 2011 and FY 2012 cost reports, and because the UPL payment had been allowed in the two prior desk reviews, YNH took the position that the DOM had recently changed its policy on this issue and argued that the change should be applied prospectively and not retroactively.

¶13.   In response, on April 20, 2016, the DOM stated that it denied YNH's appeal and reasoned that

> According to, **Mississippi Medicaid State Plan, 4.19-D, Chapter 3, 3-9, Upper payment Limit (UPL)** "100 percent of the calculated UPL will be paid to the non-state government owned or operated facilities, in accordance with applicable state and federal laws and regulations, including any provisions specified in appropriations by the Mississippi Legislature."
>
> **Mississippi Code 43-13-145** "The Division shall assess each hospital and, if the program is established for nursing facilities, shall assess each nursing facility, for the sole purpose of financing the state portion of the Medicare Upper Payments Limits Program."

**CFR Title 42, 433.51(c) Public Funds as the State Share of Financial Participation** "The public funds are not Federal funds, or are Federal funds authorized by Federal law to be used to match other Federal funds."

In summary, including the inter-governmental transfer (IGT) for the facility's UPL payment on Line 4-43, reimbursable costs, is in violation of both state code and federal regulation, as the facility would be receiving state and federal funds to finance the facility's IGT. If the facility places the IGT on line 4-43 the IGT would be reimbursed with both state and federal funds, thereby negating "for the sole purpose of financing the state share" and federal funds being used to receive federal funds.

According to CMS regulations, the state share of the Mississippi nursing facility (NF) UPL does not qualify as a tax, as it is not paid by all NF providers and considered a broad-based and uniform tax. The NF UPL match is different from the broad-based bed tax and the tax used to fund the state share of the hospital supplemental payments, which are paid by all hospitals.

In addition, the desk review cover letter states, "Your cost report is subject to additional adjustments brought to the attention of the Division of Medicaid and may be selected for field review, which could result in changed and additional adjustments."

After the denial of its appeal, YNH requested an appeal and administrative hearing regarding Amended III Desk Review.

¶14.    In the interim, on September 30, 2016, YNH submitted an amended cost report.[1] On December 7, 2016, the DOM wrote to YNH stating that it had received YNH's amended 2013 cost report. In response, the DOM stated that it had conducted another desk review, Amended IV Desk Review.[2] First, the DOM again disallowed the $1,116,643 nursing home

---

[1] This rendered moot YNH's request for an appeal and administrative hearing regarding Amended III Desk Review.

[2] Manuel Ray Pilgrim, director of the Office of Financial and Performance Review, performed the Amended IV Desk Review.

7

UPL payment. Second, the DOM disallowed a $70,566 hospital assessment paid by Yalobusha Hospital, stating that it was not an allowable nursing home expense.

¶15. Third, the DOM adjusted $34,858 in nursing home social services allocation costs. Because the amended hospital cost report submitted by Lefoldt with YNH's amended cost report was not filed with the DOM's hospital program or with Medicare, the DOM stated that it was considered unofficial. The DOM stated that it had instead utilized Yalobusha Hospital's cost report as finalized by Medicare for Yalobusha Hospital dated May 13, 2016. And lastly, the DOM removed $68,221 from the administrative and general cost center in the cost report, reasoning that it was excess overhead from the disallowance of YNH's UPL assessment in Amended III Desk Review.

¶16. On January 25, 2017, YNH appealed the four adjustments the DOM made in Amended IV Desk Review. It argued that the only adjustment that had been made in its amended cost report was to revise the allocation basis for social services, which resulted in an increase of $36,448 in the social services costs allocated to YNH and a decrease in the same amount of social services costs allocated to Yalobusha Hospital. The effect of this change was only a decrease of $1,495 in Medicare reimbursement to Yalobusha Hospital. However, in order to file an amended hospital cost report with Medicare, the provider is required to request a reopening of the finalized cost report and to show that a material error had been made on the previous report. YNH argued that "[i]n determining a material error, the amended cost report must have a Medicare reimbursement impact of 'at least $10,000 for Acute Hospitals' before Novitas will approve such a request to reopen the finalized Medicare

8

cost report." Thus, because the change only decreased the Medicare reimbursement by $1,495, Medicare would not have accepted the amended cost report. YNH requested that the DOM accept the hospital cost report that was submitted as part of YNH's amended cost report.

¶17.    On February 24, 2017, the DOM denied YNH's appeal request. On March 29, 2017, YNH submitted a request for a formal administrative hearing regarding Amended IV Desk Review. An administrative hearing was held on September 26 and 27, 2018. On May 17, 2019, the hearing officer found that the DOM had committed no errors and that its determinations had been based on substantial evidence. The hearing officer recommended the approval of the desk review findings. Accordingly, the DOM denied YNH's appeal.

¶18.    YNH appealed the DOM's Final Order to the Chancery Court of the First Judicial District of Hinds County. The chancery court found that the DOM had acted arbitrarily, capriciously, or unreasonably in each of its adjustments and ruled in favor of YNH on all issues.

¶19.    The DOM now appeals and presents the following four issues: 1) whether the DOM correctly disallowed YNH's UPL payment of $1,116,643; 2) whether the DOM correctly disallowed the $70,566 payment that was a portion of the Mississippi Hospital Assessment; 3) whether the DOM correctly disallowed a $34,858 social services cost; and 4) whether the DOM correctly made an adjustment of $68,221 to the nursing home administrative and general expenses as a result of the disallowance of the nursing home UPL assessment.

**ANALYSIS**

9

¶20. "On appeal, the Court reviews the decision of an administrative agency to determine whether the decision was supported by substantial evidence, was arbitrary or capricious, was beyond the agency's power to adopt, or was violative of a constitutional or statutory provision." *King v. Miss. Mil. Dep't*, 245 So. 3d 404, 407 (Miss. 2018) (citing *Watkins Dev., LLC v. Hosemann*, 214 So. 3d 1050, 1053 (Miss. 2017)). Further,

> This Court must often determine whether a [trial] court has exceeded its authority in overturning an agency action, and we proceed aware that "a rebuttable presumption exists in favor of the action of the agency, and the burden of proof is on the party challenging an agency's action." Where that authority has been exceeded, this Court will not hesitate to reverse and reinstate the agency's order.

*Miss. Transp. Comm'n v. Anson*, 879 So. 2d 958, 963 (Miss. 2004) (citations omitted).

¶21. This Court reviews "agency interpretations of rules and regulations de novo, without deference to the agency's interpretation." *Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 319 So. 3d 1049, 1055 (Miss. 2021). This Court also applies a de novo standard of review to an agency's interpretation of a statute. *Id.* at 1054.

I. **Whether the DOM properly corrected and disallowed on YNH's FY 2013 Medicaid Cost Report a line item of approximately $1.1 million claimed by YNH as an allowable cost.**

¶22. YNH claimed as a tax cost on line 4-43 of its cost report a nursing home UPL assessment of $1,116,643. That payment was an IGT used to fund the state share of the federal match for the DOM's UPL program. As a result of the IGT, YNH received a supplemental UPL payment of $4,202,646.

¶23. The hearing officer found that, because the nursing home bed tax was set at the maximum rate allowed by federal law, no additional tax could be imposed on nursing

10

facilities as an assessment for payment of the state share match for the UPL federal funds. Therefore, the hearing officer found that YNH's IGT was not a tax and was not an allowable cost because of the prohibition of using federal or state funds to finance YNH's IGT payment. Additionally, the hearing officer found that the UPL assessment was not related to the reasonable and necessary care of Medicaid beneficiaries. The hearing officer also rejected YNH's argument that the DOM had failed to remove the UPL assessment in previous cost reports and stated that the DOM had the authority to make corrections or adjustments to desk reviews.

¶24.    In contrast, the chancery court found probative that Medicaid had allowed the UPL assessment on cost reports in years past and in the two prior desk reviews before Amended III Desk Review. Thus, it found that the adjustment removing the UPL tax was improper, reasoning that while Medicaid has the authority to make a change to allowability of costs, "it should, at a minimum, do so by published rule and not by an unwritten practice subject to ad hoc and sporadic application." *Wilkerson v. Miss. Emp. Sec. Comm'n*, 630 So. 2d 1000, 1002 (Miss. 1994). Mississippi Code Section 25-43-3.103 provides that "[a]t least twenty-five (25) days before the adoption of a rule an agency shall cause notice of its contemplated action to be properly filed with the Secretary of State for publication in the administrative bulletin." Miss. Code Ann. § 25-43-3.103(1) (Rev. 2018). The chancery court rejected the DOM's argument that it had merely clarified existing policy regarding the hospital and nursing home UPL assessments and found that a change in the state plan would have required notice under Section 25-43-3.103.

11

### A.    Whether an IGT is a tax.

¶25.    The DOM argues that the nursing home UPL was properly removed from the tax cost line of the cost report because it is not a tax. YNH does not substantively address this issue in its brief and instead focuses on its argument that DOM precedent and policy established a "norm" of accepting the UPL assessment.

### i.    By Definition

¶26.    Under 42 Code of Federal Regulations, Section 433.51,

> (a) Public Funds may be considered as the State's share in claiming [Federal Financial Participation (FFP)] if they meet the conditions specified in paragraphs (b) and (c) of this section.
>
> (b) The public funds are appropriated directly to the State or local Medicaid agency, or are transferred from other public agencies (including Indian tribes) to the State or local agency and under its administrative control, or certified by the contributing public agency as representing expenditures eligible for FFP under this section.
>
> (c) The public funds are not Federal funds, or are Federal funds authorized by Federal law to be used to match other Federal funds.

42 C.F.R. § 433.51 (West, Westlaw through July 19, 2020). Therefore, IGTs are permitted as a method of using public funds as the state share of financial participation. The IGT is made to the State Medicaid Fund. Peter Michael Daschbach, the office director for reimbursement for the DOM, testified that the "facility pays the state share amount of whatever the federal match rate is for the state share, would pay that exact amount to draw down their portion—their Upper Payment Limit."

¶27.    The DOM first argues that, by definition, the IGT is a *transfer* of funds between units of government and is not a generalized tax. Black's Law Dictionary defines a "tax" as "[a]

12

charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue." *Tax*, Black's Law Dictionary (11th ed. 2019). A "transfer" is defined as "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance." *Transfer*, Black's Law Dictionary (11th ed. 2019).

### ii. Bed Tax

¶28. Further, the DOM argues that an IGT cannot be a tax because long-term care nursing facilities were already taxed for Medicaid purposes at the maximum rate permitted by federal law. Under Mississippi Code Section 43-13-117,

> The division shall establish a Medicare Upper Payment Limits Program . . . for hospitals, and may establish a Medicare Upper Payment Limits Program for nursing facilities . . . . The division shall assess each hospital and, if the program is established for nursing facilities, shall assess each nursing facility, for the sole purpose of financing the state portion of the Medicare Upper Payment Limits Program.

Miss. Code Ann. § 43-13-117(A)(18)(b).

¶29. Mississippi Code Section 43-13-145 provides that "[u]pon each nursing facility licensed by the State of Mississippi, there is levied an assessment in an amount set by the division, equal to the maximum rate allowed by federal law or regulation, for each licensed and occupied bed of the facility." Miss. Code Ann. § 43-13-145(1)(a). Therefore, the DOM argues that no additional Medicaid-related tax could be imposed on long-term care nursing facilities. Accordingly, the DOM argues that it relied on IGTs to supply the state portion of the UPL program as an alternative method, because it could not additionally tax nursing homes.

13

¶30.   We agree that the IGT is not a tax. By statute, nursing facilities that participate in the UPL program are taxed at the maximum rate allowed by federal law. Thus, the IGT was not a tax, but an alternative way for long-term nursing facilities to pay the state share match for the UPL funds.

### iii.   Healthcare-Related Taxes

¶31.   The DOM next argues that the IGT also did not meet the requirements of a healthcare-related tax under federal Medicaid law. Code of Federal Regulations 42, section 433.68, provides

> (b) Permissible health care-related taxes. Subject to the limitations specified in § 433.70, a State may receive, without a reduction in [Federal Financial Participation (FFP)], health care-related taxes if all of the following are met:
>
>> (1) The taxes are broad based, as specified in paragraph (c) of this section;
>>
>> (2) The taxes are uniformly imposed throughout a jurisdiction, as specified in paragraph (d) of this section; and
>>
>> (3) The tax program does not violate the hold harmless provisions specified in paragraph (f) of this section.

42 C.F.R. § 433.68(b) (West, Westlaw through July 19, 2022).  The DOM must meet the above requirements in order to not have a reduction in its federal match. The DOM argues that an IGT is neither broad based nor uniform.

¶32.   The first requirement of a healthcare-related tax is that the tax must be broad based. Under Code of Federal Regulations 42, section 433.68(c),

> (1) A health care-related tax will be considered to be broad based if the tax is imposed on at least all health care items or services in the class or providers of such items or services furnished by all non-Federal, non-public providers

14

in the State, and is imposed uniformly, as specified in paragraph (d) of this section.

(2) If a health care-related tax is imposed by a unit of local government, the tax must extend to all items or services or providers (or to all providers in a class) in the area over which the unit of government has jurisdiction.

42 C.F.R. § 433.68(c)(1), (2) (West, Westlaw through July 19, 2022). Daschbach testified that the IGT assessment on government non-state nursing homes to fund the UPL program is not broad-based, because it is not paid by all nursing facilities in the state. The assessment is paid only by the government non-state nursing facilities, which constitute approximately 10 percent of the nursing facilities in the state.

¶33.     Second, healthcare-related taxes must be uniformly imposed throughout a jurisdiction. Under  Code of Federal Regulations 42, section 433.68(d),

A health care-related tax will be considered to be imposed uniformly even if it excludes Medicaid or Medicare payments (in whole or in part), or both; or, in the case of a health care-related tax based on revenues or receipts with respect to a class of items or services (or providers of items or services), if it excludes either Medicaid or Medicare revenues with respect to a class of items or services, or both. The exclusion of Medicaid revenues must be applied uniformly to all providers being taxed.

42 C.F.R. § 433.68(d) (West, Westlaw through July 19, 2022). Daschbach testified that the assessment is not uniformly imposed throughout the state; it is only imposed on the county-owned nursing facilities that qualify to receive a supplemental UPL payment. Thus, Daschbach testified that the assessment is facility specific. Additionally, the IGT is not a set percentage or amount, but it varies by facility and is dependent on what the specific facility's overall UPL payment is.

15

¶34. Lastly, the tax program must not violate the hold harmless provisions specified in Code of Federal Regulations 42, section 433.68(f). Daschbach testified that the government non-state nursing home assessment violates the hold harmless provisions because the nursing facilities are guaranteed to get their money back. According to Daschbach, there is no provision stating that if the facility pays the assessment, there is no guarantee that it will get its money back. Because the UPL assessment is not broad based or uniformly imposed, and because the DOM does not assess a government non-state nursing facility an IGT unless the facility will receive an UPL payment, we agree with the DOM's assertion that the IGT does not qualify as a healthcare-related tax.

### iv. Line Item 4-43

¶35. On the Medicaid cost report, Line Item 4-43 is a tax and licenses line. The Instructions for Filing Long-Term Care Facility Cost Report states that Line Item 4-43 should be "[t]he cost of taxes and licenses that are not included on any other line on Form 6. This includes tags for vehicles, the Medicaid bed tax and licenses for facility staff (including nurse aide recertifications) and buildings." The DOM argues that the bed tax is specified as a proper entry on Line Item 4-43; ergo, it argues that the Medicaid bed tax is the only tax that the DOM is authorized to assess for long-term nursing facilities. Daschbach pointed out that Line Item 4-43 does not reference a nursing facility's UPL assessment in any way.

¶36. In *Mississippi Methodist*, this Court emphasized that the hospital Medicaid assessment was "not specifically listed as an allowable cost on the nursing facility's cost report." *Miss. Methodist*, 319 So. 3d at 1055. It continued, stating that "the instructions for

16

filing provide that line 4-43 for taxes and licenses should include 'the Medicaid bed tax' (a term for the nursing facility assessment), but make no mention of apportioning the hospital assessment in that line." *Id.* at 1055-56. Similarly, Line Item 4-43 does not reference the UPL assessment in any way.

### v. Actually Incurred

¶37. The DOM contends that the IGT was not a permissible tax because YNH received in supplemental UPL payments four times as much revenue than it transferred. It argues that the Medicare Provider Reimbursement Manual, Part 1, Chapter 21, Section 2122.1, mandates that "[t]axes are allowable costs to the extent that they are actually incurred . . . ." Ctrs. for Medicare & Medicaid Servs., *Provider Reimbursement Manual* 1-21 2122.1, https://cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929 (last visited Aug. 23, 2022). Because YNH received approximately four times what it paid in the IGT, the DOM argues that the IGT was not a cost that was actually incurred and cannot be considered a tax. Accordingly, the IGT cannot be considered a tax because it does not meet the requirement of being "actually incurred." For these reasons, this Court finds that YNH's IGT does not meet the definition of a tax for reimbursement purposes.

### B. Was the IGT an allowable cost under the Medicaid State Plan?

¶38. In addition to arguing that the IGT was not a tax, the DOM asserts that the IGT also was not an "allowable cost" under the State Plan for long-term care nursing facilities. The DOM emphasizes that the text of State Plan, Attachment 4.19-D, does not contain any

17

reference to an IGT assessment. Attachment 4.19-D, Section 2-1, is titled, "Allowable and Non-allowable Costs." State Plan Attachment 4.19-D states under subsection 2-1A, titled, "Allowable Costs," that "[i]n order for a cost to be an allowable cost for Medicaid reimbursement purposes, it must be reasonable and necessary in the normal conduct of operations related to providing patient care in accordance with CMS PRM 15-1 guidelines." State Plan 4.19-D, 2-1(A). The State Plan lists allowable costs and, under subsection 21, titled, "Medicaid Assessment" states, "[t]he monthly nursing facility, ICF/IID and PRTF bed assessments based on bed occupancy, will be considered allowable costs on the cost report filed by each long-term care facility, in accordance with the CMS Provider Reimbursement Manual, Part 1, Section 2122.1." State Plan 4.19-D, Section 2-1(A)(21). Daschbach testified that the Medicaid assessments under the UPL program are not listed as allowable costs because they are not a tax and because they are not related to the reasonable and necessary care of Medicaid beneficiaries. Instead, Daschbach testified that those costs "are strictly to get a supplemental payment that we are allowable to draw down from the federal government, in addition to their per diem."

¶39.	The DOM reiterates that, although the bed tax is specifically mentioned as an allowable cost, the IGT is not included and is not otherwise designated as allowable in the State Plan. This argument is notable, but not dispositive, as the Plan states that "[t]he following list of allowable costs is not comprehensive, but serves a general guide and clarifies certain key expense areas. The absence of a particular cost does not necessarily mean that it is not an allowable cost." State Plan 4.19-D, Section 2-1(A).

### C.     Allowable Cost - Actually Incurred

¶40.    The DOM maintains that the IGT is not a tax. However, in the alternative, it argues that even if the IGT could be classified as a tax, YNH still could not claim it as an allowable cost on its cost report. The Medicare Provider Reimbursement Manual, Part 1, Chapter 21, Section 2122.1, provides that

> The general rule is that taxes assessed against the provider, in accordance with the levying enactments of the several States and lower levels of government and for which the provider is liable for payment, are allowable costs. Tax expense should not include fines and penalties. Taxes are allowable costs to the extent they are actually incurred and related to the care of beneficiaries.

CMS PRM 1-21 § 2122.1. Chapter 21, Section 2122.7, titled, "Costs Related to Patient Care" states that

> In general, reasonable costs claimed by a provider, including taxes, must be actually incurred. While a tax may fall under a category that is generally accepted as an allowable Medicare cost, the provider may only treat the net tax expense as the reasonable cost actually incurred for Medicare payment purposes. The net tax expense is the tax paid by the provider, reduced by payments the provider received that are associated with the assessed tax. Contractors will continue to determine whether taxes and other expenses are allowable based on reasonable cost principles set forth in the Medicare statute and regulations.

CMS PRM 1-21 § 2122.7.

¶41.    The DOM asserts that a reasonable cost actually incurred means that only the netted amount of the cost—the amount of the assessment less any payments the provider receives that are related to the assessment—may be accepted as an allowable Medicare cost. Because YNH paid the IGT and received the UPL supplement within a matter of days, the DOM claims there is a clear link that requires the payment to be netted. YNH had a net gain of

19

approximately $3.1 million; therefore, the DOM contends that the IGT cannot be considered a reasonable and allowable cost.

¶42. For the above-cited reasons, the DOM argues that the administrative hearing findings and conclusions were clearly supported by substantial evidence. It urges this Court to reverse and vacate the chancery court's decision and to reinstate the agency decision. We find that long-term nursing facilities are already taxed at the maximum rate allowed by law. Therefore, the IGT is an alternative method, and not a tax, to supply the State share to obtain the federal UPL match. Additionally, the Cost Report Instructions for Line 4-43 do not specify the IGT as an allowable cost. The State Plan, Attachment 4.19-D, also does not specify that the IGT is an allowable cost. Further, the DOM correctly argues that the IGT is not "actually incurred" because YNH directly received approximately four times more than it paid in. Accordingly, we reverse the chancery court's decision, and we reinstate the DOM's final order on this issue.

### D. Did the DOM establish a norm by allowing the UPL assessment in prior cost reports and in prior desk reviews?

¶43. YNH's central argument is that the precedent and policy of Medicaid had been that the UPL assessment was an allowable cost on the Medicaid nursing home cost report. The nursing home UPL program was established in 2011. Lefoldt testified that the cost of the UPL tax had been accepted in the FY 2011 and FY 2012 cost reports. In addition, the UPL assessment was not disallowed in the first two desk reviews of the FY 2013 cost report. Therefore, YNH argues that the DOM's decision to retroactively remove the assessment from the FY 2013 cost report was both arbitrary and capricious.

20

¶44. YNH concedes that the DOM has the authority to change the allowability of costs; however, it argues that "it should, at a minimum, do so by published rule and not by an unwritten practice subject to ad hoc and sporadic application." *Wilkerson*, 630 So. 2d at 1002. YNH argues that Medicaid also had not inadvertently missed the UPL assessment in prior years, because in November 2012, Medicaid issued a desk review for YNH's FY 2011 cost report and made an adjustment to Line 4-43, which had included the UPL assessment. The adjustment did not remove the assessment, however, and the UPL assessment was left as an allowable cost.

¶45. Further, the DOM sent out a UPL invoice to eligible providers that stated "[t]his invoice assesses the *tax*" to cover the state share of the 2012 UPL payments. Thus, the DOM itself referred to the assessment as a tax. Daschbach testified that the invoice came from the DOM's accounting department and not the reimbursement department and stated he was not sure if the accounting department understood the difference between a tax and an assessment.

¶46. YNH contends that Medicaid's continued allowance of the UPL assessment during the desk review process was also indicative of Medicaid's policy and that it had established a "norm" of accepting the UPL tax cost on the cost reports of hospital-based nursing facilities. "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Valley Gas Co. v. Fed. Energy Regul. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981) (citing *Sec'y of Agric. v. United States*, 347 U.S. 645, 74 S. Ct. 826, 98 L. Ed. 1015 (1954)). YNH asserts that Medicaid provided no reason for its departure from its established policy of accepting the UPL tax as an allowable

21

cost. Therefore, it contends that the DOM's decision to disallow the UPL on the FY 2013 was arbitrary and capricious.

¶47. Further, YNH stated that, even if the DOM mistakenly allowed the UPL assessment, YNH should not be forced to suffer the consequences of its error, and the DOM should be equitably estopped from disallowing the assessment. This Court previously has held that "the state and its political subdivisions 'may be equitably estopped under the proper circumstances.'" *Hill v. Thompson*, 564 So. 2d 1, 14 (Miss. 1989) (quoting *Monroe Cnty. Bd. of Educ. v. Rye*, 521 So. 2d 900, 908-09 (Miss. 1988)). Equitable estoppel is defined as

> the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.
>
> The doctrine of estoppel is based upon the ground of public policy, fair dealing, good faith and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon.

*Mayor & Bd. of Aldermen of Clinton v. Welch*, 888 So. 2d 416, 424 (Miss. 2004) (quoting *Koval v. Koval*, 576 So. 2d 134, 137 (Miss. 1991)). An estoppel claim requires: "(1) Belief and reliance on some representation; (2) Change of position, as a result thereof; (3) Detriment or prejudice caused by the change of position." *Suggs v. Town of Caledonia*, 470 So. 2d 1055, 1057 (Miss. 1985) (quoting *Covington Cnty. v. Page*, 456 So. 2d 739, 741 (Miss. 1984)).

¶48. YNH argues that all of the elements of equitable estoppel are present here. It states that the DOM repeatedly represented to YNH that the UPL assessment was an allowable

cost. As a result, YNH relied on the representations and continued to include the UPL tax as an allowable cost in its cost reports. YNH lastly claims that the change in Medicaid's policy has been to its detriment.

¶49. The UPL program was not established until 2011, and the cost report at issue was for FY 2013. This Court recently rejected a hospital-based nursing home's argument that the DOM's inclusion of the hospital assessment as an allowable cost in its cost report established a norm. *Miss. Methodist*, 319 So. 3d at 1058. Like in *Mississippi Methodist*, Daschbach testified that the UPL assessment had not been identified in the past. He stated that the DOM had made a mistake in past years by not removing the assessment from cost reports. Daschbach testified,

> We don't always get everything right. We could make mistakes. The providers can make mistakes. But if it's identified, we're going to go back and correct it as long as we can. I mean, one thing about accounting is, is if there's an error, we try—you know, you can go back and adjust it and correct. So that's—you know, it was an error on my staff's part by not identifying it; but it's never, ever been in our State Plan saying that that was an allowable cost. And it does not meet the definitions of a tax to be considered an allowable cost by the federal regulations.

As this Court has held, "[t]he State Plan specifically placed [providers] on notice that '[i]n the absence of specific instruction or guidelines in this plan, facilities will submit cost data for *consideration* for reimbursement.'" *Miss. Methodist*, 319 So. 3d at 1058 (quoting State Plan 4.19-D, 2-1). And, "[i]n any event, agencies may correct mistakes of law, even when a party relied to its detriment on the mistake." *Id.* at 1059 (citing *Dixon v. United States*, 381 U.S. 68, 72-73, 85 S. Ct. 1301, 14 L. Ed. 2d 223 (1965)); *see also Miss. Div. of Medicaid v. Windsor Place Nursing Ctr., Inc.*, 296 So. 3d 68, 74 (Miss. 2020) ("While the DOM may

have failed to catch this in the past, legend drugs covered by Medicaid's Drug Program are subject to direct reimbursement from Medicaid to the dispensing pharmacist, and constitute a non-allowable cost for the provider's *pier diem* reimbursement report. And any action taken to the contrary by Medicaid is a violation of its rules and regulations.").

¶50. The DOM did not establish a norm by accepting prior cost reports that included the nursing home UPL assessment. Additionally, the DOM's decision to disallow the nursing home UPL assessment on YNH's FY 2013 cost report was supported by substantial evidence. Therefore, we reverse the chancery court's order and reinstate the DOM's decision on this issue.

**II.     Whether Yalobusha Hospital's allocation of a portion of its hospital assessment to the YNH was an allowable cost on the nursing facility's own FY 2013 Medicaid Cost Report.**

¶51. Under Mississippi Code Section 43-13-145(4), each hospital licensed in the state is required to pay an annual assessment ("hospital assessment"). Miss. Code Ann. § 43-13-145(4)(a)(i) (Rev. 2021). This hospital assessment helps fund the Medicaid program, as well as the DSH and UPL supplemental payment programs. *Id.* For the 2013 fiscal year, Yalobusha Hospital allocated $70,566 of its hospital assessment to YNH. The hearing officer found that YNH presented no credible evidence specifically showing that the hospital assessment related to patient care at YNH. Therefore, it found that the DOM's disallowance of the hospital assessment on YNH's cost report was reasonable and not arbitrary or capricious.

¶52. The chancery court disagreed and found that Medicaid had changed its policy to categorize the hospital assessment as non-allowable. It found dispositive that the DOM had considered the hospital assessment as an allowable cost on YNH's prior-year cost reports.

¶53. The DOM contends that this issue is directly controlled by this Court's holding in *Mississippi Methodist*. There, the DOM disallowed the inclusion of the hospital assessment in a hospital-based nursing-facility cost report. *Miss. Methodist*, 319 So. 3d at 1052-53. This Court found that "the decision to disallow a portion of Methodist's assessment from Specialty's cost report was not error, even under a de novo standard of review of the DOM's interpretation of its rules and regulations." *Id.* at 1058. Like YNH and Yalobusha Hospital, Methodist owned Specialty and the two entities did not have separate finances or operating organizations. *Id.* at 1052. Specialty also had been including the hospital assessment on its cost report "for a number of years." *Id.* at 1053. This Court reasoned that

> The State Plan for nursing facilities specifically, by code subsection, lists the nursing facility Medicaid Assessment as an allowable cost. It directly points to CMS PRM 2122.1 as authority for this allowable cost. CMS PRM 2122.1 allows taxes assessed against the provider and for which the provider is liable as a cost. The provider for purposes of Specialty's Medicaid cost report is Specialty, not Methodist. Specialty acknowledges that it is not assessed and is not liable for payment for Methodist's hospital assessment. The hospital assessment is not referred to at all, much less by its code subsection, in the State Plan for nursing facilities. The hospital assessment is an allowable cost in its entirety for Methodist under the State Plan for hospitals. Further, the State Plan provides that when Medicaid cost-reporting rules conflict with CMS PRM 15-1, Medicaid rules take precedence. A central conflict between Medicaid cost reporting and CMS PRM 15-1 is that nursing facilities are treated as completely separate providers from any owner hospital for Medicaid cost-reporting purposes but are treated as a cost center of the hospital for Medicare purposes. Medicaid's treatment of nursing facilities as separate providers for purposes of cost reporting, and thus for assessments and reimbursements, is a fundamental difference from Medicare reporting rules

25

that nursing facilities must take into account. And when such treatment creates a conflict, Medicaid reporting rules trump.

The plain language of the State Plan allows a nursing facility to include its Medicaid Assessment in its cost report and allows a hospital to include its assessment in its cost report. The State Plan's plain language further provides that only taxes incurred by the provider are properly considered allowable costs for that provider. Because Specialty did not incur Methodist's hospital assessment, Methodist's hospital assessment was not an allowable cost for Specialty under the State Plan.

. . . .

Specialty is the "provider" for Medicaid cost reporting purposes. The hospital assessment is not assessed against Specialty, nor is Specialty liable for it. And Specialty has a separate assessment it is assessed and is liable for that it does list as an allowable cost. Thus, this argument fails, as the hospital assessment is not assessed against Specialty, and Specialty does account for the nursing-facility assessment that it pays.

*Id.* at 1056.

¶54. This Court also specifically rejected Specialty's argument that "the DOM allowed the inclusion of a portion of the hospital assessment on Specialty's cost reports for several years and improperly changed its interpretation of the State Plan to disallow a portion of the hospital assessment as a cost without notice." *Id.* at 1058. It stated that "[e]ven principles of equitable estoppel require reliance on a representation, and Specialty points to no affirmative representation by the DOM that the hospital assessment was an allowable cost for nursing facilities." *Id.* This court continued, stating that

[B]ecause the hospital assessment is not specifically listed in the State Plan as an allowable cost for nursing facilities, Specialty had no justification to rely on its being included in allowable costs. The State Plan specifically placed Specialty on notice that "[i]n the absence of specific instructions or guidelines in this plan, facilities will submit cost data for *consideration* for reimbursement." State Plan 4.19-D, 2-1 (2015).

*Id.* And further, this Court found that, "[i]n any event, agencies may correct mistakes of law, even when a party relied to its detriment on the mistake." *Id.* at 1059 (citing *Dixon*, 381 U.S. at 72-73).

¶55. YNH argues that *Mississippi Methodist* can be distinguished because the DOM provided guidance that the hospital assessment was an allowable cost for hospital-based nursing facilities when it conducted a training program on April 30, 2013, titled, "Long-Term Care Facilities Cost Report Preparation Training." There, T.J. Walker, an accounting/auditing division director at Medicaid, presented a session titled "Hospital-Based (Medicare C/R)" where a sample hospital-based nursing facility cost report was reviewed. Lefoldt testified that he attended the training session and that Walker used the sample report as an example for attendees to refer to when preparing their cost reports. The sample report included the hospital assessment in the hospital's administrative and general (A&G) costs. The hospital assessment was then reflected in the allowable costs for the nursing home cost report. Therefore, YNH argues that it followed the instructions it received from the DOM at the training seminar and relied on the DOM's prior norm of accepting the allocation of the hospital assessment in YNH's prior cost reports.

¶56. We find YNH's argument unpersuasive. The training seminar did not constitute an "affirmative representation" by the DOM that the hospital assessment was an allowable cost. *Miss. Methodist*, 319 So. 3d at 1058. This is emphasized by the fact that this Court did not consider the DOM's allowance of the assessment on prior cost reports an affirmative representation by the DOM in *Mississippi Methodist*. And, as previously stated, this Court

27

specifically found that "*[i]n any event*, agencies may correct mistakes of law, even when a party relied to its detriment on the mistake." **Id.** at 1059 (emphasis added).

¶57. This issue is controlled by this Court's recent decision in **Mississippi Methodist**. Therefore, the chancery court erred by finding that DOM improperly disallowed the hospital assessment on YNH's FY 2013 cost report. Accordingly, we reverse the decision of the chancery court and reinstate the decision of the DOM on this issue.

**III.** **Whether the DOM properly disallowed $34,858 in social services costs allocated by Yalobusha Hospital to YNH that did not match the cost numbers in the hospital's filed and audited Medicare cost report.**

¶58. The DOM next disallowed $34,858 in social services costs in YNH's cost report. The hearing officer found that the DOM's ability to perform a legitimate desk review of YNH's amended cost report was dependent upon the use of hospital costs reported on the Medicare worksheets that were officially on file with Medicare and Medicaid. He also found that YNH did not sufficiently rebut the DOM's testimony that desk reviews of cost reports use the latest available Medicare finalized cost report. Therefore, the hearing officer held that the DOM had a strong legal basis for removal of the social services costs.

¶59. It is unclear from the chancery court's order the basis for finding that the DOM erred on this issue. The chancery court stated that

> Yalobusha erred in its Initial Cost Report it submitted to Medicaid. The error was made in calculating how much 'time spent' was applicable to Yalobusha. Realizing its mistake that additional costs should have been included, Yalobusha timely filed, and Medicaid accepted, an amended Medicaid cost report on September 30, 2016 to include the additional $36,337 in allowable social services costs.

28

Under State Plan 4.19-D(H), which applies to long term care facilities, the DOM "accepts amended cost reports . . . for a period of thirty-six (36) months following the end of the reporting period." State Plan 4.19-D(H). The end of the reporting period for the cost report at issue was September 30, 2013. Therefore, the deadline for submission of an amended nursing home cost report was September 30, 2016. YNH timely submitted its amended cost report on September 30, 2016.

¶60.    However, under Attachment 4.19-A of the state plan, which applies to hospitals, the DOM "accepts amended cost reports if the cost report is submitted prior to the end of the reimbursement period in which the cost report is used for payment purposes." State Plan 4.19-A, 2-2. Yalobusha Hospital's 2013 Medicaid cost report was used to set its Medicaid reimbursement for FY 2015; therefore, the hospital had until September 30, 2015, to file an amended hospital cost report. Accordingly, the time period to file an amended Medicaid hospital cost report had closed before YNH submitted its September 2016 amended cost report.

¶61.    Further, Yalobusha Hospital's Medicare cost report had been finalized on May 13, 2016, before YNH submitted its amended cost report. Under Provider Reimbursement Manual Section 2931.2, which governs Medicare cost reports for hospitals, "[w]hether or not the intermediary will reopen a determination, otherwise final, will depend on whether new and material evidence has been submitted, or a clear and obvious error was made, or the determination is found to be inconsistent with the law, regulations and rulings, or general instructions." CMS PRM 2931.2. Under limited circumstances, the program will accept an

amended cost report, such as "to correct material errors detected subsequent to the filing of the original cost report." *Id.*

¶62. YNH states that in order to file an amendment to a final settled Medicare hospital cost report, the monetary impact of the amendment must be at least $10,000. The inclusion of the additional social services costs on the YNH Medicaid cost report increased the nursing home's allowable costs by $36,337; however, the reimbursement effect on the amended Medicare hospital cost report only would have resulted in a decrease of $1,495 in Medicare reimbursement. Therefore, YNH asserts that Medicare would not have accepted an amended Medicare Hospital cost report that included this revised allocation of the social services costs. YNH argues that this should have no bearing on its right to amend its Medicaid cost report.

¶63. The DOM argues that it adjusted YNH's allocated costs to match the filed and audited costs reported by the hospital to Medicare. It contends that the social services costs were not costs that YNH itself incurred but that the hospital incurred and then allocated to other cost centers, including the nursing facility. Thus, in its desk review process, the DOM states that it relied on the underlying numbers submitted in the provider's finalized and audited Medicare cost report. Daschbach testified that Medicaid could not accept an unfiled Medicare hospital cost report. Pilgrim testified that when the DOM does a desk review, it refers back to the latest available Medicare finalized cost report as the base starting point for the allocation of the nursing facilities.

¶64. Additionally, State Plan Attachment 4.19A states that under the common audit program, the DOM

30

has entered into agreements with Medicare intermediaries for participation in a common audit program of Titles XVIII and XIX. Under this agreement, the intermediaries for participation in a common audit program shall provide the [DOM] the results of the field audits of those hospitals located in Mississippi, upon the [DOM] request to the Medicare intermediary. The [DOM] may also request a copy of the final cost report from the provider.

State Plan 4.19-A, 2-5(B). YNH argues this section in no way supports the disallowance of the social services costs.

¶65.    It was reasonable for the DOM to use the finalized and audited Medicare hospital cost report that had been accepted by the Medicare Intermediary when determining costs that the hospital incurred. YNH stated in its letter for reconsideration that "we ask that you accept the Hospital cost report that was submitted as part of the Provider's amended cost report as the 'official' Medicare cost report in lieu of the final Medicare cost report in making DOM's adjustment per this desk review." It cannot have been arbitrary and capricious for the DOM to reject YNH's urge to use an unofficial hospital cost report in lieu of the finalized and audited hospital cost report that was available. Therefore, we reverse the decision of the chancery court and reinstate the DOM's decision on this issue.

**IV.    Whether the DOM correctly made an adjustment of $68,221 to the nursing home administrative and general expenses.**

¶66.    Lastly, the DOM disallowed $68,221 in claimed administrative overhead costs in YNH's FY 2013 cost report. The removal of this expense was solely due to the disallowance of YNH's UPL assessment on the cost report. Therefore, the removal of this expense also was appropriate.

**CONCLUSION**

31

¶67. The nursing home UPL assessment was neither a tax nor an allowable cost for reimbursement purposes. Consequently, the DOM's adjustment of YNH's administrative and general expenses was appropriate. Further, the inclusion of a portion of Yalobusha Hospital's hospital assessment was not an allowable cost under this Court's recent precedent. The DOM also did not err by utilizing the official Medicare cost report to determine the appropriate social services costs for YNH. Therefore, we reverse the decision of the chancery court and render judgment reinstating the final decision of the DOM.

¶68. **REVERSED AND RENDERED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL, J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶69. Because I find that the Mississippi Division of Medicaid's (DOM) adjustments were arbitrary and capricious, I would affirm the chancellor's judgment.

¶70. This Court has defined arbitrary and capricious as follows:

> "Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,—absolute in power, tyrannical, despotic, non-rational,—implying either a lack of understanding of or a disregard for the fundamental nature of things.

> "Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.

***Beverly Enters. v. Miss. Div. of Medicaid***, 808 So. 2d 939, 943 (Miss. 2002) (quoting

***McGowan v. Miss. State Oil & Gas Bd.***, 604 So. 2d 312, 322 (Miss. 1992)).

I.       *Upper Payment Limits (UPL) Assessment*

¶71.    Yalobusha County Nursing Home (YNH) included the cost of the UPL tax in Line 4-43, under taxes and licenses, of its cost report.  The DOM, in its third desk review, removed YNH's UPL payment in the amount of $1,116,643.  I find the DOM's adjustment removing the UPL assessment tax was improper.

¶72.    The precedent and policy of the DOM has been that the UPL tax is an allowable cost on the DOM nursing home cost report for YNH.  Richard Lefoldt, an expert in Medicare and Medicaid cost reporting and reimbursement, testified that the cost of the UPL tax had been included in every cost report filed by YNH since the inception of the nursing home UPL program in 2011 and that the DOM has allowed this cost in each subsequent cost reporting year.  Indeed, prior to its third desk review, the DOM had allowed YNH's UPL assessment to be claimed as an allowable cost on the cost report.

¶73.    The DOM was aware of the inclusion of the UPL tax in prior reviews.  For instance, the DOM issued its desk review report for YNH's 2011 Medicaid cost report, and it made an adjustment to Line 4-43 where the UPL tax was included.  But the adjustment did not remove the UPL tax.  Instead, the adjustment was made to adjust the bed tax to the allowable limit.  The UPL tax was left as an allowable cost.  After the 2011 desk review, the DOM also allowed the UPL tax on YNH's 2012 cost report and the first two desk reviews of the 2013 cost report.

¶74. The purpose of a desk review is to determine the completeness, accuracy, consistency, and compliance with the Mississippi Medicaid State Plan and Division of Medicaid policy. Upon completion of the first two desk reviews, the DOM advised YNH that based on its review, YNH's cost report appeared to be filed in accordance with the Medicaid State Plan and applicable federal and state laws and regulations. Thus, the desk review's completion and the DOM's assertion affirmed that the UPL tax was allowable, and YNH relied on it.

¶75. When questioned as to why the UPL tax was continuously allowed by the DOM, Michael Daschbach, DOM's office director for reimbursement, stated that the DOM staff had "not identified" that the UPL tax was being included in cost reports and that this had been a "mistake." But, as explained by Lefoldt, this "mistake" had been ongoing for the lifetime of the nursing home UPL program.

¶76. The DOM's continued allowance of the UPL tax during the desk review process was indicative of the DOM's policy and the allowability of the UPL tax costs, and it established a "norm" of accepting the UPL tax cost on the cost reports of hospital-based nursing facilities. "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Miss. Valley Gas Co. v. Fed. Energy Regul. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981) (citing *Sec'y of Agric. v. United States*, 347 U.S. 645, 74 S. Ct. 826, 98 L. Ed. 1015 (1954)). The DOM has provided no reason for its departure from its established policy of accepting the UPL tax as an allowable cost. Its decision to disallow the UPL tax is therefore arbitrary and capricious.

II. *Hospital Assessment*

34

¶77. For the 2013 fiscal year, Yalobusha General Hospital (Yalobusha hospital) allocated $70,566 of its hospital assessment to YNH. But, following a desk review, the DOM concluded that the hospital assessment was no longer reimbursable as an allowable cost. I find the DOM's adjustment disallowing the hospital assessment was improper.

¶78. On April 30, 2013, during the middle of YNH's 2013 cost reporting period, the DOM conducted an all-day "Long-Term Care Facilities Cost Report Preparation Training" seminar. The purpose of the training seminar was to assist providers with the proper and full completion of the cost report and to allow Medicaid to readily review facility costs for compliance with the State Plan and Medicaid policy.

¶79. Those present at the training seminar received a training manual. A sample hospital-based nursing facility cost report was included in the training manual. According to Lefoldt, the sample cost report was used "as an example of how to fill out the cost report, as an example that we could take back with us and use as a guide to completing the next cost report."

¶80. Notably, Worksheet A-8 of the DOM's sample cost report, located at page 20, details the adjustments to expenses and shows that the hospital assessment is included at Line 45 as an administrative and general (A&G) cost of the hypothetical hospital. Thereafter, on page 25, the sample cost report indicates at Line 44 that the A&G costs, which again included the hospital assessment, should be allocated to the nursing home on an accumulated cost basis. Also, page 13 of the sample cost report shows that these allocated A&G costs were reflected

35

in the allowable costs for the nursing home Medicaid cost report per "Schedule 6-Administrative and Operating Allocated Costs-Hospital Based and State Facilities."

¶81.    Following this training seminar, YNH completed its cost report as instructed by the DOM and as YNH had done every other year, and it included the hospital assessment in its A&G costs. YNH had no reason to think such an inclusion was incorrect because allocations of the hospital assessment on hospital-based nursing homes' Medicaid cost reports had not been disallowed since the statutory enactment of the hospital assessment in 2002. But despite the DOM's directives in the training seminar and its prior practice of allowing the hospital assessment on hospital-based nursing homes' cost reports, the DOM suddenly disallowed the allocation in the 2013 cost report during its *third* desk review.

¶82.    This departure from the norm was acknowledged by Manuel Pilgrim, the DOM's director of the Office of Financial and Performance Review. Pilgrim agreed that the DOM did not disallow the allocation to the nursing facilities at any time prior to his arrival. Pilgrim explained that apparently no one understood how hospital allocations worked. But based on the guidance provided by the DOM during its training seminar, it is apparent that the DOM understood that the hospital assessment was an allowable cost on the cost reports of hospital-based nursing facilities.

¶83.    In *Mississippi Methodist Hospital and Rehabilitation Center, Inc. v. Mississippi Division of Medicaid*, this Court determined that the hospital-based nursing facility "d[id] not offer any evidence that allowing a hospital assessment on a nursing-facility cost report was an affirmative 'norm' or 'decision' by the DOM." *Miss. Methodist Hosp. & Rehab.*

36

***Ctr., Inc. v. Miss. Div. of Medicaid***, 319 So. 3d 1049, 1058 (Miss. 2021). Here, unlike in ***Mississippi Methodist***, YNH has provided evidence that (1) the hospital assessment was never disallowed prior to Pilgram's arrival at the DOM, (2) multiple providers including YNH and Mississippi Methodist historically included the hospital assessment on the cost reports of their hospital-based nursing facilities, and (3) the DOM had hosted a training seminar to aid providers in preparing their cost reports, at which it specifically instructed hospital-based nursing facilities to include the hospital assessment on its cost reports.

¶84.   "[T]hose regulated by an administrative agency are entitled to know the rules by which the game will be played." ***United States v. AMC Entm't, Inc.***, 549 F.3d 760, 768 (9th Cir. 2008) (internal quotation marks omitted) (quoting ***Ala. Prof'l Hunters Ass'n v. Fed. Aviation Admin.***, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by* ***Perez v. Mortgage Bankers Ass'n***, 575 U.S. 92, 101, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015)). YNH relied upon the prior decades-old norm of the DOM's accepting the hospital assessment and the DOM's specific instructions to include the hospital assessment on the cost report. The DOM cannot be allowed to rely upon blanket statements in the State Plan concerning what is reasonable and necessary to provide care while simultaneously giving providers training manuals that indicate that it considers and has always considered such costs reasonable and necessary. This is especially true when no other specific guidance has been provided.

¶85.   The DOM's indifference to its prior treatment of the hospital assessment and to its training manual that specifically includes the hospital assessment as an allowable cost implies

both "a lack of understanding" and "a disregard for the surrounding facts and settled controlling principles." ***Beverly Enters.***, 808 So. 2d at 943 (quoting ***McGowan***, 604 So. 2d at 322). Accordingly, the DOM's disallowance of the hospital assessment on YNH's cost report is arbitrary and capricious. ***Id.*** (quoting ***McGowan***, 604 So. 2d at 322). The chancellor's judgment reversing the DOM's decision should be affirmed.

III.    *Social Services Cost*

¶86.    The DOM disallowed $34,858 in social services costs in YNH's cost report. I find the DOM's denial of the social services costs was improper.

¶87.    On September 30, 2016, YNH filed an amended cost report that included an additional $36,337 in allowable social services costs. Pursuant to Attachment 4.19-D of the State Plan, nursing facilities can amend Medicaid cost reports "in electronic format for a period of thirty-six (36) months following the end of the reporting period." Because the cost reporting period at issue was fiscal year end September 30, 2013, YNH's amended cost report was accepted by the DOM as timely filed.

¶88.    Following acceptance of the cost report, the DOM disallowed the additional social services costs because "[t]he hospital cost report documentation . . . was not filed with either DOM's hospital program and or Medicare, and therefore [wa]s considered unofficial." The DOM asserted that once Yalobusha hospital's cost report was filed, it could not remedy the later-filed cost report of its nursing home without also remedying the cost reports of Yalobusha hospital with Medicare and Medicaid. But as YNH asserts, this contention is disingenuous.

¶89. In order for a hospital to file an amendment to its final Medicare cost report, the amendment must be material, requiring a reimbursement impact of at least $10,000 for acute hospitals. Because the change in allocation would only result in a decrease of $1,495 in Medicare reimbursement, Yalobusha hospital was unable to reopen the Medicare cost report and file an amendment.

¶90. Additionally, in order for a hospital to file an amendment to its Medicaid cost report, it must do so before the end of the reimbursement period in which the cost report is used for payment purposes. The record reflects that Yalobusha hospital had until September 30, 2015, to file an amendment to its Medicaid cost report. Thus, by the time YNH's amended cost report was filed in September 2016, Yalobusha hospital was unable to file an amendment to its Medicaid cost report.

¶91. The DOM's disregard for the fact that Yalobusha hospital could not file an amended Medicare and Medicaid cost report constitutes a capricious act because it purposefully disregards the facts surrounding YNH's filing. *Beverly Enters.*, 808 So. 2d at 943 (quoting *McGowan*, 604 So. 2d at 322). The restrictions applied by the DOM are not provided for in the State Plan and arbitrarily set a separate standard for hospital-based nursing homes to amend their Medicaid cost reports. I agree with the chancellor that the DOM's removal of $34,858 in social services costs was arbitrary and capricious. I would therefore affirm the chancellor's judgment.

**MAXWELL, J., JOINS THIS OPINION.**